AO 106A  (08/18)  Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT

for the

Southern District of California

**FILED**

10/19/22

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY      VYC      DEPUTY

|  |  |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br><br>White iPhone<br>Model: Unknown<br>With no other identifying numbers or features | )<br>)<br>)<br>)<br>)<br>)<br>) |

Case No.   22MJ8721

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A-1, incorporated herein by reference.

located in the _____ Southern _____ District of _____ California _____, there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B, incorporated herein by reference.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

- ☑ evidence of a crime;
- ☐ contraband, fruits of crime, or other items illegally possessed;
- ☑ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 8 USC 1324 | Transportation of Illegal Aliens |

The application is based on these facts:

See Attached Affidavit of Border Patrol Agent Cristina Fuentes incorporated herein by reference.

- ☐ Continued on the attached sheet.
- ☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Border Patrol Agent Cristina Fuentes
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by

_____ telephone _____ *(specify reliable electronic means).*

Date:   10/19/2022

_____
*Judge's signature*

City and state:  El Centro, California

HON. LUPE RODRIGUEZ, JR, U.S. MAGISTRATE JUDGE
*Printed name and title*

## **ATTACHMENT A-1**
PROPERTY TO BE SEARCHED

The following property is to be searched:

**A-1:**    White iPhone
       Model: Unknown
       With no other identifying numbers or features
       Seized from Oscar Humberto SOTO-Farias
       **(Target Device #1)**

 

The **Target Device** is currently in the possession of the Department of Homeland Security, El Centro Border Patrol Sector Asset Forfeiture Office, 211 West Aten Road, Imperial, California 92251, and located in the evidence room of that office.

## ATTACHMENT B

ITEMS TO BE SEIZED

Authorization to search the mobile telephone described in Attachment A-1 and A-2 includes the search of disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the Target Devices for evidence described below.

The evidence to be seized from the mobile telephones will be electronic records, communications, and data, such as emails, text messages, chats and chat logs from various third-party applications, photographs, audio files, videos, and location data limited to the time period of September 12, 2022, up to and including October 12, 2022, and is limited to the following:

a.   tending to reflect planning of and/or involvement in efforts to bring illegal aliens into the United States from Mexico and transport them within the United States;

b.   tending to identify other facilities, storage devices, or services – such as email addresses, IP addresses, and/or phone numbers – that may contain electronic evidence tending to indicate efforts to bring illegal aliens into the United States from Mexico and transport them within the United States;

c.   tending to identify co-conspirators, criminal associates, or others involved in efforts to bring illegal aliens into the United States from Mexico and transport them within the United States;

d.   tending to identify travel to or presence at locations involved in efforts to smuggle illegal aliens into and through the United States;

e.   tending to identify the user of, or persons with control over or access to, the Target Devices;

f.   tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved in the activities described above;

which is evidence of the transportation of illegal aliens in violation of Title 8 U.S.C. § 1324.

# AFFIDAVIT

I, Cristina Fuentes, United States Border Patrol Agent, having been duly sworn, depose and state as follows:

## INTRODUCTION

1.    I submit this affidavit in support of an application for warrant(s) to search the following electronic device(s):

**A-1:**          White iPhone
                  Model: Unknown
                  With no other identifying numbers or features
                  Seized from Oscar Humberto SOTO-Farias
                  **(Target Device #1)**

**A-2:**          Black iPhone
                  Model: Unknown
                  With no other identifying numbers or features
                  Seized from D.O.M.
                  **(Target Device #2)**

as further described in Attachment A-1 and A-2, and to seize evidence of a crime, specifically, violations of Title 8, United States Code, Section 1324 (Alien Smuggling), as further described in Attachment B.

2.    The requested warrant relates to the investigation and prosecution of Oscar SOTO-Farias (SOTO) and D.O.M. (D.O.M), for illegally bringing into the United States aliens: Claudio MENDEZ-Bolanos, Ana Aidee LEON-Gomez and Celestina VELASCO-Pascual (the "Material Witnesses") in violation of Title 8 U.S.C. § 1324 within the Southern District of California.  The Target Devices were seized from SOTO and D.O.M. on or about October 11, 2022, incident to their arrest. The Target Devices are currently in the possession of the Department of Homeland Security, El Centro Border Patrol Sector Office, 211 West Aten Road, Imperial, California 92251, and located in the evidence room of that office.

3.    Because this affidavit is being submitted for the limited purpose of establishing probable cause in support of the application for a search warrant, it does not

1

set forth every fact that I, or others, have learned during the course of this investigation. The information contained in this Affidavit is based upon my personal observations and knowledge, my review of various official reports, and upon conversations with other Border Patrol Agents.  Dates and times are approximate.

## EXPERIENCE AND TRAINING

4.      I am a United States Border Patrol Agent with the Department of Homeland Security, Customs and Border Protection, United States Border Patrol ("USBP"). I have been employed as a full-time, sworn federal BPA with the USBP since May 2019, and graduated from the USBP Basic Border Patrol Training Academy located in Artesia, New Mexico. The 24-week Academy curriculum covers specialized training in the Immigration and Naturalization Act, criminal law, and statutory authority, as well as cross-training in Title 21, United States Code, Controlled Substances law, and in Title 19, United States Code, Customs law.

5.      I am currently assigned to the El Centro Sector Prosecutions Unit.  The El Centro Sector Prosecutions Unit is tasked with the responsibility of investigating and prosecuting alien smuggling organizations that utilize the Southern and Central Districts of California as an operational corridor. In the course of my duties as a Border Patrol Agent, I investigate and prepare cases for prosecution against persons involved in the inducement of the illegal entry of undocumented aliens into the United States; the smuggling of undocumented aliens into the United States; and the transportation and harboring of undocumented aliens within the United States.

6.      Through the course of my training, investigations, and conversations with other law enforcement personnel, I have gained a working knowledge of the operational habits of alien smugglers and alien transporters, in particular those who attempt to smuggle aliens into the United States from Mexico and transport them throughout the Southern District of California.  I am aware that it is a common practice for alien smugglers to work in concert with other individuals and to do so by utilizing cellular telephones to maintain communications with co-conspirators and/or illegal aliens in order to further their criminal

activities. Because they are mobile, the use of cellular telephones permits alien smugglers and transporters to easily carry out various tasks related to their smuggling activities, including, *e.g.*, remotely monitoring the progress of the aliens while the aliens are in transit, providing instructions to transporters, guiding aliens to specific pick up locations, warning accomplices about law enforcement activity in the area and the status of check-point operations, and communicating with co-conspirators who guide aliens, coordinate drop off locations, and/or operate alien stash houses.

7.     The smuggling of aliens generates many types of evidence, including, but not limited to, cellular phone-related evidence such as voicemail messages referring to the arrangements of travel, names, photographs, text messaging (via SMS or other applications), and phone numbers of co-conspirators and illegal aliens. For example, drivers and passengers responsible for transporting illegal aliens are typically in telephonic contact with co-conspirators immediately prior to and/or following the crossing of the illegal aliens at the border, at which time they receive instructions, including where to pick-up the illegal aliens for transportation into the United States and where to take the illegal aliens after crossing into the United States. These communications may also include locations for delivery to stash houses and/or sponsors. Illegal aliens also are typically in telephonic contact with co-conspirators prior to and following their crossing in order to make smuggling arrangements, receive instructions, and report their locations after crossing.

8.     Based upon my training, experience, and consultations with law enforcement officers experienced in narcotics trafficking investigations, and all the facts and opinions set forth in this affidavit, I know that cellular telephones (including their Subscriber Identity Module (SIM) card(s)) can and often do contain electronic evidence, including, for example, phone logs and contacts, voice and text communications, and data, such as emails, text messages, chats and chat logs from various third-party applications, photographs, audio files, videos, and location data. In my experience and consultation with law enforcement officers experienced in alien smuggling investigations, I am aware that individuals engaged

in alien smuggling may store photos and videos on their cell phones that reflect or show co-conspirators and associates engaged in alien smuggling, as well as images and videos with geo-location data identifying alien smuggling transportation routes, and communications to and from recruiters and organizers.

9. This information can be stored within disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the cellular telephone. Specifically, searches of cellular telephones may yield evidence:

a. tending to indicate efforts to smuggle aliens from Mexico into the United States;

b. tending to identify accounts, facilities, storage devices, and/or services–such as email addresses, IP addresses, and phone numbers–used to facilitate alien smuggling and transportation of smuggled aliens;

c. tending to identify co-conspirators, criminal associates, or others involved in alien smuggling, or transportation of smuggled aliens;

d. tending to identify travel to or presence at locations involved in the smuggling, transportation, or harboring of illegal aliens, such as stash houses, load houses, or delivery points;

e. tending to identify the user of, or persons with control over or access to, the Target Device(s); and/or

f. tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved in the activities described above.

**FACTS SUPPORTING PROBABLE CAUSE**

10. On October 11, 2022, Border Patrol Agents from the Calexico Station were conducting linewatch operations approximately 25 miles east of Calexico, California Port of Entry.  In this area, the border between the United States and Mexico is separated by a 20-foot metal border fence.  This area is mostly desert terrain and the All-American Canal (AAC). The AAC is a man-made canal that flows west from the Colorado River into the Imperial Valley.  Access across the AAC is limited to Border Patrol Agents and Imperial

4

Irrigation District (IID) employees who cross the AAC through bridges that are gated and maintained locked at all times.  At approximately 3:07 pm., BPA B. Bringle, who was working in the Calexico Border Patrol Station's Remote Video Surveillance System (RVSS) camera room, observed three individuals walking north from the US/Mexico Border Fence.  BPA Bringle observed the three individuals walk to the AAC, enter the canal and swim north across the AAC to exit on the north side. BPA Bringle observed the three individuals then run north towards Interstate-8.

11.     As the individuals were making their way north towards I-8, BPA K. Chavez observed a small red sport utility vehicle, later identified as a 2006 Suzuki Grand Vitara, traveling east on I-8 and exit at the Gordon's Well Road overpass exit. The Gordon's Well Road overpass exit is approximately five miles east of where the individuals were running north. BPA Chavez observed the Suzuki drive north over the overpass, reenter I-8 in the westbound lanes and then drive west on I-8 back towards the three individuals. From his location, BPA Chavez relayed this information via Service radio.

12.     Concurrently, as the illegal aliens were making their way north towards I-8, Border Patrol K. Chavez, observed a small red sport utility vehicle, later identified as a 2006 Suzuki Grand Vitara, traveling east on I-8 and exit at the Gordon's Well Road overpass exit.  The Gordon's Well Road overpass exit is approximately five miles east of where the suspected illegal aliens were running north. Agent Chavez observed the Suzuki drive north over the overpass, turn west, and re-enter I-8 in the westbound lanes towards the direction where the three suspected illegal aliens had been observed by RVSS. Agent Chavez relayed this information via Service radio.

13.     BPA Bringle, observing on RVSS, observed the three individuals run across the eastbound lanes of I-8 and into the westbound lanes of I-8 before they stopped on the westbound shoulder of I-8. The Suzuki stopped on the shoulder of the westbound lanes and all three individuals entered the vehicle. BPA Bringle observed the Suzuki drive westbound on I-8 and relayed this information via Service radio.  Meanwhile, BPA A. Mills, who was in full Border Patrol uniform and driving a fully marked Border Patrol vehicle, was parked

near the Brocks Research Center Road overpass listening to the Service radio and observing the vehicle traffic. The Brock's Research Center Road overpass is approximately one mile east of where the three individuals entered the Suzuki. BPA Mills drove his Service vehicle onto the westbound lanes of I-8 and began to close the distance between his vehicle and the Suzuki.

14.    BPA R. Alfaro, who was in full Border Patrol uniform and assigned a fully marked Service vehicle, was parked on "Old 80" near the area where the Suzuki picked up the individuals.  "Old 80" is a roadway that parallels I-8 and is approximately 30 yards north of I-8. BPA Alfaro drove his Service vehicle westbound alongside the Suzuki and maintained surveillance on the Suzuki.  BPA Alfaro observed the Suzuki approach the "East Y." which is an overpass on I-8 where State Route 98 and I-8 intersect east of Calexico, California. BPA Alfaro continually updated Agents in the field the position of the Suzuki via Service radio.  BPA H. Hacegaba, who was dressed in full Border Patrol uniform and driving a fully marked Border Patrol vehicle, was parked on the westbound shoulder of I-8 approximately one quarter mile east of the "East Y."  Agent Hacegaba stated via Service radio that he would be setup at his current location with a Controlled Tire Deflation Device (CTDD) in order to disable the Suzuki's tires.  BPA Mills maintained surveillance on the Suzuki and continually relayed its position via Service radio. BPA Hacegaba observed the approaching Suzuki and deployed his CTDD into the roadway in front of the Suzuki. The Suzuki drove over the CTDD, which deflated the front driver's side tire of the vehicle, and continued westbound on I-8.

15.    BPA Alfaro entered I-8 in the westbound lanes at the "East Y" and he and BPA Mills began to follow the Suzuki. BPA Mills, who was behind the Suzuki, observed the Suzuki slow down, pull to the slow lane, and then the shoulder.  BPA Mills drove his Service vehicle in behind the Suzuki, relayed its' license plate via the Service radio, and the vehicle switched to the fast lane. BPA Mills activated his Service vehicle's emergency lights and siren and the Suzuki continued driving westbound. BPA Mills observed the rear passenger door open and one individual attempt to exit the vehicle, but then pause. The

Suzuki then slowed down a little more and that individual jumped out of the vehicle as it was still moving and ran into the median of I-8. BPA M. Toler, who was dressed in full Border Patrol uniform and was driving a fully marked Border Patrol vehicle, was driving behind BPA Mills when the rear seat passenger jumped from the moving Suzuki. BPA Toler pulled his Service vehicle into the median and detained the individual that jumped from the Suzuki. BPA Mills then observed the Suzuki perform a U-turn through the dirt median of I-8 and enter the eastbound lanes of I-8. BPA Mills observed the Suzuki pull to the shoulder of the eastbound lanes of I-8 and BPA Mills pulled up long side of the vehicle. Agent Mills then observed the driver, later identified as SOTO, and front passenger, later identified as D.O.M. (a juvenile), exit the Suzuki and run south away from the vehicle into the open desert. At that time, the Suzuki was still moving and only stopped after making contact with the front passenger tire of BPA Mills' Service vehicle. After the Suzuki stopped, BPA Mills approached the Suzuki and observed two individuals seated in the rear passenger seat. BPA Mills detained these two individuals.

16.    BPA J. Bourque, who was dressed in full Border Patrol uniform and was driving a fully marked Border Patrol vehicle, was driving westbound on I-8 and observed the Suzuki perform the U-turn through the median and stop on the shoulder. BPA Bourque drove his Service vehicle across the median and onto the shoulder of the eastbound lanes of I-8. BPA Bourque observed SOTO and D.O.M running south through the desert away from the Suzuki. BPA Bourque drove his Service vehicle south through the open desert and pulled in the path of SOTO and D.O.M. as they were fleeing. Both SOTO and D.O.M stopped running. BPA Bourque ordered SOTO and D.O.M to lay on the ground, which they did. BPA Toler arrived at Agent Bourque's position and detained both SOTO and D.O.M in the rear of his Service vehicle. All five detained subjects were interviewed at the site of the stopped Suzuki by BPA Mills. It was determined by BPA Mills that the three rear passengers of the Suzuki, later identified as Claudio MENDEZ-Bolanos, Ana Aidee LEON-Gomez and Celestina VELASCO-Pascual, were citizens of Merxico illegally present in the United States. It was also determined that D.O.M was a juvenile United

States Citizen. SOTO claimed to be a citizen of Mexico illegally present in the United States at the time of his arrest. It was later determined that he is a United States Citizen during processing at the Calexico Border Patrol Station. SOTO and D.O.M and the three individuals were placed under arrest and transported to the Calexico Border Patrol Station for further processing and further interviews.

17.     A search incident to the arrest of both SOTO and D.O.M. by Border Patrol Agent M. Toler revealed two cell phones.  One white iPhone (Target Device #1) was found in the pants pocket of SOTO. SOTO claimed ownership of the white i-Phone.  One black iPhone (Target Device #2) was found in the pocket of D.O.M.  D.O.M. claimed ownership of the black i-Phone.

18.     At the Calexico Station, a videotaped sworn statement of SOTO was conducted by BPA Alfaro and BPA D. Davalos. SOTO was advised of his Miranda rights in the Spanish language. SOTO stated that he understood his rights and was willing to answer questions without an attorney present.  During the interview, SOTO he currently lives in Mexicali, Baja California.  SOTO admitted that on today's date he was offered a job from an unknown smuggler to transport illegal aliens.  SOTO received instructions and, after picking up the vehicle, he drove to his friend's home (D.O.M.) home to ask him if he wanted to participate.  SOTO stated that he would be paid $300.00 for each illegal alien he transported.  SOTO stated he told D.O.M. he would give him half of what he made if he would accompany him. SOTO admitted he picked up three illegal aliens and he knew Border Patrol was following him but he wanted to get away because he had previously been arrested for transporting illegal aliens.  SOTO stated he accelerated to get away but that the vehicle did not accelerate fast enough.  SOTO admitted telling the illegal aliens to get out of the car, but that they would not listen to him. SOTO stated he knew what he did and was wrong.  SOTO was presented with a Six-Pack photo lineup 1B and was able to identify Photo #4 as the co-principle.  Photo #4 represents D.O.M.

19.     Material Witness MENDEZ stated he made arrangements to be smuggled into the United States for $9,700.00 USD. MENDEZ was presented with a Six-Pack photo

lineup 1A and was able to identify photo #2 as the driver of the Suzuki.  Photo #2 represents Oscar SOTO-Farias.  Material Witness LEON stated that he made arrangements to be smuggled into the United States for $11,000.00 USD. LEON was presented with a Six-Pack photo lineup 1A and was able to identify photo #2 as the driver of the Suzuki.  Photo #2 represents Oscar SOTO-Farias.  LEON was presented with a Six-Pack photo lineup 1B and positively identified photo #4 as the front passenger of the Suzuki. Photo #4 represents D.O.M.  Material Witness VELASCO stated that he made arrangements to be smuggled into the United States for $12,500.00 USD. VELASCO was presented with a Six-Pack photo lineup 1A and was able to identify photo #2 as the driver of the Suzuki.  Photo #2 represents Oscar SOTO-Farias.  VELASCO was presented with a Six-Pack photo lineup 1B and positively identified photo #4 as the front passenger of the Suzuki. Photo #4 represents D.O.M.

20.    Based upon my experience and investigation in this case, I believe that SOTO, D.O.M. and other persons, as yet unknown, were involved in an alien smuggling venture and that SOTO and D.O.M. used the Target Devices to coordinate with the as yet unknown persons to bring the aliens into the United States and/or transport them further into the United States.  Additionally, I believe that recent calls made and received, telephone numbers, contact names, electronic mail (e-mail) addresses, appointment dates, text messages, pictures, and other digital information are stored in the memory of the Target Devices, which may identify other persons involved in alien smuggling activities.

21.    I am aware that smuggling conspiracies require planning to successfully evade detection by law enforcement.  In my professional training and experience, this may require planning and coordination in the days and weeks prior to the event.  Additionally, co-conspirators are often unaware of the subject's arrest and will continue to attempt to communicate with the subject after the arrest to determine their whereabouts.  Given this, I respectfully request permission to search the Target Devices for data beginning on September 12, 2022, up to and including October 12, 2022, the day after the arrests of SOTO and D.O.M.

## METHODOLOGY

22.   It is not possible to determine merely by knowing the cellular telephone's make, model and serial number, the nature and types of services to which the device is subscribed and the nature of the data stored on the device.  Cellular devices today can be simple cellular telephones and text message devices, can include cameras, can serve as personal digital assistants and have functions such as calendars and full address books, and can be mini-computers allowing for electronic mail services, web services, and rudimentary word processing.  An increasing number of cellular service providers now allow for their subscribers to access their device over the internet and remotely destroy all of the data contained on the device.  For that reason, the device may only be powered in a secure environment or, if possible, started in "flight mode," which disables access to the network.  Unlike typical computers, many cellular telephones do not have hard drives or hard drive equivalents and, instead, store information in volatile memory within the device or in memory cards inserted into the device.  Current technology provides some solutions for acquiring some of the data stored in some cellular telephone models using forensic hardware and software.  Even if some of the stored information on the device may be acquired forensically, not all of the data subject to seizure may be so acquired.  For devices that are not subject to forensic data acquisition or that have potentially relevant data stored that is not subject to such acquisition, the examiner must inspect the device manually and record the process and the results using digital photography.  This process is time and labor intensive and may take weeks or longer.

23.   Following the issuance of this warrant, a case agent familiar with the investigation will collect the Target Devices and subject them to analysis. All forensic analysis of the data contained within the telephones, and their memory cards will employ search protocols directed exclusively to the identification and extraction of data within the scope of this warrant.

24.   Based on the foregoing, identifying and extracting data subject to seizure pursuant to this warrant may require a range of data analysis techniques, including manual

1  review, and, consequently, may take weeks or months. The personnel conducting the

2  identification and extraction of data will complete the analysis within ninety (90) days of

3  the date the warrant is signed, absent further application to this Court.

4  **CONCLUSION**

5      25.   Based on all the facts and circumstances described above, I believe that

6  probable cause exists to conclude that SOTO and D.O.M. used the Target Devices to

7  facilitate the offense of alien smuggling. The Target Devices likely were used to facilitate

8  the offense by transmitting and storing data, specifically that described in Attachment B,

9  which constitutes evidence of violations of Title 8, United States Code, Section 1324. I

10  also believe that probable cause exists to believe that evidence of illegal activity committed

11  by SOTO, D.O.M., the Material Witnesses, and others continues to exist on the Target

12  Devices. Therefore, I respectfully request that the Court issue this warrant.

13

14      I swear the foregoing is true and correct to the best of my knowledge and belief.

15

16

17                       Cristina Fuentes, Border Patrol Agent
                     United States Border Patrol

18

19      Attested to by the applicant in accordance with the requirements of Fed. R. Crim.

20  P. 4.1 by telephone on this 19th day of October, 2022.

21

22                11:21 a.m.

23  HON. LUPE RODRIGUEZ, JR.
UNITED STATES MAGISTRATE JUDGE

24

25

26

27

28

11

## **ATTACHMENT A-1**
PROPERTY TO BE SEARCHED

The following property is to be searched:

**A-1:**           White iPhone
                   Model: Unknown
                   With no other identifying numbers or features
                   Seized from Oscar Humberto SOTO-Farias
                   **(Target Device #1)**



The **Target Device** is currently in the possession of the Department of Homeland Security, El Centro Border Patrol Sector Asset Forfeiture Office, 211 West Aten Road, Imperial, California 92251, and located in the evidence room of that office.

## ATTACHMENT A-2
PROPERTY TO BE SEARCHED

The following property is to be searched:

**A-2:**    Black iPhone
        Model: Unknown
        With no other identifying numbers or features
        Seized from D.O.M.
        **(Target Device #2)**



The **Target Device** is currently in the possession of the Department of Homeland Security, El Centro Border Patrol Sector Asset Forfeiture Office, 211 West Aten Road, Imperial, California 92251, and located in the evidence room of that office.

## ATTACHMENT B

ITEMS TO BE SEIZED

Authorization to search the mobile telephone described in Attachment A-1 and A-2 includes the search of disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the Target Devices for evidence described below.

The evidence to be seized from the mobile telephones will be electronic records, communications, and data, such as emails, text messages, chats and chat logs from various third-party applications, photographs, audio files, videos, and location data limited to the time period of September 12, 2022, up to and including October 12, 2022, and is limited to the following:

a.   tending to reflect planning of and/or involvement in efforts to bring illegal aliens into the United States from Mexico and transport them within the United States;

b.   tending to identify other facilities, storage devices, or services – such as email addresses, IP addresses, and/or phone numbers – that may contain electronic evidence tending to indicate efforts to bring illegal aliens into the United States from Mexico and transport them within the United States;

c.   tending to identify co-conspirators, criminal associates, or others involved in efforts to bring illegal aliens into the United States from Mexico and transport them within the United States;

d.   tending to identify travel to or presence at locations involved in efforts to smuggle illegal aliens into and through the United States;

e.   tending to identify the user of, or persons with control over or access to, the Target Devices;

f.   tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved in the activities described above;

which is evidence of the transportation of illegal aliens in violation of Title 8 U.S.C. § 1324.